**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **JOSEPH A. FRANKLIN,** | ) |  |
|  | ) |  |
| **Plaintiff,** | ) |  |
|  | ) |  |
| **v.** | ) | **Civil Action No. 07-1205 (ESH)** |
|  | ) |  |
| **JOHN POTTER,** | ) |  |
| **Postmaster General,** | ) |  |
|  | ) |  |
| **Defendant.** | ) |  |

_____)

## <u>MEMORANDUM OPINION</u>

Plaintiff Joseph A. Franklin is an African-American male employed by the United States Postal Service ("the Postal Service," "USPS," or "the agency"). He claims that his employer discriminated against him on the basis of his race, gender, and disability, retaliated against him for complaining about that discrimination, and subjected him to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*[1] Defendant has moved for summary judgment on all of plaintiff's claims. For the reasons set forth below, defendant's motion will be granted.

---

[1] Plaintiff also alleges discrimination and retaliation on the basis of "handicap." (Compl. ¶¶ 51, 54.) Because "handicap" is statutorily synonymous with "disability," the Court will merge its analysis of the two concepts. *See Adams v. Rice*, 531 F.3d 936, 959 n.8 (D.C. Cir. 2008) (noting that Rehabilitation Act was amended to replace the "dated" term "handicap" with "disability," and "the earlier version defined 'individual with handicaps' in the same way that the current version defines 'individual with a disability'").

**BACKGROUND**

Plaintiff has been employed by the Postal Service as a mail handler in the Curseen-Morris

Processing and Distribution Center ("P&DC") in Washington, D.C. since 1992.[2]  (*See* Pl.'s

Opposing Facts ["Pl.'s Facts"] at 1.)  At all times relevant to this matter, plaintiff worked as a

Level 4 mail handler.  (*Id.*)

## I.      PLAINTIFF'S MEDICAL CONDITIONS

Prior to his employment with the Postal Service, plaintiff served in the military, where he

developed permanent problems with his knees and was also diagnosed with eosiniphilic gastritis.

(Compl. ¶ 13; Def.'s Ex. 1 (excerpts of Pl.'s Dep., Mar. 23, 2006) ["Franklin Dep."[3]] at 41.)

Plaintiff's knee problems affect his ability to stand, bend, climb, twist and lift.  (Pl.'s Facts at

10.)  Plaintiff suffers from episodes of gastritis two to five times a year, during which he

experiences significant stomach pain, inability to eat, vomiting, swelling, and general pain and

discomfort.  (*Id.* at 9-10; Franklin Dep. at 39.)  Plaintiff takes prednisone, a chronic steroid

treatment, in order to help alleviate the symptoms of his gastritis.  (Franklin Dep. at 70.)

In 2002 or 2003, as a side effect of his prednisone treatment, plaintiff developed a mood

disorder that generally increased his stress level and caused mood lability (*i.e.*, mood swings)

and irritability.  (Pl.'s Facts at 10; Pl.'s Ex. 3 (Aug. 22, 2003 letter from Dr. Jentgen); Franklin

Dep. at 74.)  Stressful situations exacerbated plaintiff's mood disorder and left him unable "to

have any form of connection with [the] person creating the stressful environment" (Pl.'s Ex. 33

(Pl.'s EEO Aff., Aug. 2, 2005) ["2005 Franklin Aff."] at 2), unable to "think clearly," and

---

[2] When the Curseen-Morris P&DC was targeted in the 2001 anthrax terrorist attack, plaintiff was transferred to another postal facility; after the facility re-opened, he was transferred back to the P&DC on December 27, 2003.  (Compl. ¶¶ 11-12.)

[3] Plaintiff also submitted additional excerpts from this deposition as Exhibit 61 to his Opposition.

wanting "to get away from the situation." (Franklin Dep. at 72.) Plaintiff's mood disorder was "triggered mostly on-the-job when someone interact[ed] with [plaintiff] in a way that he perceive[d] to be negative or unreasonable." (Def.'s Ex. 10 (April 3, 2007 Final Agency Decision) ["USPS Decision"] at 16 (citing Franklin Dep.).) Plaintiff takes lithium once a day to treat his mood disorder. (Franklin Dep. at 74.) In 2003, plaintiff's right hand developed tenosynovitis, a tendon condition that affects his ability to lift because of swelling in his hand.[4] (Pl.'s Facts at 10.)

## II.   PLAINTIFF'S WORKPLACE COMPLAINTS

### A.   January - April 2004: Plaintiff's Time on the Parcel Bundle Sorter

From approximately January through April 2, 2004, plaintiff was assigned to the small parcel bundle sorter ("SPBS") under the direct supervision of Denise Berry, supervisor of Distribution Operations. (Franklin Dep. at 9-12; Pl.'s Ex. 7 (Apr. 2, 2004 medical unit report); Def.'s Ex. 2 (excerpts of Denise Berry Dep., Feb. 10, 2006) ["Berry Dep."] at 10-12.) From plaintiff's perspective, his working relationship with Berry quickly soured and became rife with what he perceived as "harassment." (*See* Pl.'s Ex. 21 (plaintiff's undated informal complaint) at 1.) Plaintiff complained that Berry was prone to "[y]elling, rolling eyes, [and] walking away when [plaintiff] approach[ed] her with problems," that she spoke "[v]ery disrespectful[ly]" to him, and that she criticized him for using the men's restroom "too frequently," "[n]ot moving

---

[4] Although plaintiff repeatedly uses the term "tinnitus" to describe his condition, and defendant does not challenge this term, the Court concludes that plaintiff is actually referring to "tenosynovitis," which is an "inflammation of a tendon sheath." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1215 (10th ed. 1996). Indeed, plaintiff's evidence demonstrates that he was later diagnosed with tenosynovitis in his left wrist. (*See* Pl.'s Ex. 17 at 4.) By contrast, "tinnitus" is a condition associated with the "sensation of noise . . . caused by a bodily condition . . . and can usu[ally] be heard only by the one affected[.]" MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1237.

fast enough while performing duties or returning from breaks," and "[n]ot being able to operate

equipment."  (*Id.* at 1-2.)

Plaintiff also accused Berry of improperly denying him leave under the Family and

Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*[5]  (*Id.* at 1.)  On January 6, 2004,

defendant received two FMLA certifications from plaintiff's medical provider, Kaiser

Permanente ("Kaiser"), regarding plaintiff's gastritis and mood disorder.  (*See* Pl.'s Exs. 4, 5.)

The gastritis certification indicated that plaintiff had no related workplace limitations, but that he

could suffer up to eight episodes each year that could each require up to two days off from work.

(Pl.'s Ex. 4 at 1-2.)  The mood disorder certification indicated that plaintiff was "unable to work"

during periods when his condition was exacerbated, which could occur up to twice a month and

require up to one week off from work per episode.  (Pl.'s Ex. 5 at 1-2.)  On January 12, 2004,

Terrence Jordan, the P&DC's FMLA coordinator, wrote to plaintiff acknowledging his

certifications and approving his request for FMLA leave.  (Pl.'s Ex. 6 (Jan. 12, 2004 letter from

Terrence Jordan to plaintiff).)  However, Jordan also told plaintiff that he would need to obtain

recertification by the end of the year; that when calling in sick, he must identify the cause of his

illness, because "[f]ailure to do so[] may result in disapproval of the FMLA request and denial of

FMLA protection for the absence"; and that he must "bring documentation stating [his] fitness to

return to duty upon [his] return from absences attributed to [his mood disorder]."  (*Id.*)

---

[5] FMLA permits eligible employees to take up to 12 workweeks of leave during any 12-
month period "[b]ecause of a serious health condition that makes the employee unable to
perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  An
employer has the right to ask for a medical certification of an employee's condition before
granting or denying leave.  *Pendarvis v. Xerox Corp.*, 3 F. Supp. 2d 53, 56 (D.D.C. 1998) (citing
29 U.S.C. § 2613).  The Postal Service routinely exercises that right.  *See, e.g., Doe v. U.S.
Postal Serv.*, 317 F.3d 339, 344 (D.C. Cir. 2003) ("The Postal Service conditioned Doe's receipt
of FMLA leave on his submission of supporting medical documentation, as the FMLA
authorized it to do.").

On January 17, 2004, plaintiff was absent from work.  (*See* Pl.'s Ex. 48 (Feb. 2, 2004 pre-disciplinary interview notes).)  When plaintiff returned to work, he gave a co-worker the paperwork necessary for him to receive FMLA protection for his absence so that the co-worker could submit the paperwork to Jordan.  (*Id.*)  However, Jordan never received plaintiff's paperwork.  (*Id.*)  As a result, on February 2, 2004, Berry noted that plaintiff's FMLA absence was "disapproved," conducted a pre-disciplinary interview with plaintiff, and issued him a "Letter of Warning" for his failure to "maintain acceptable attendance."  (*Id.*)

In March 2004, plaintiff received a bid assignment to the Mechanized Opening Unit ("Robotics"), to begin in early April.  (Franklin Dep. at 11; Pl.'s Ex. 7.)  On April 2, 2004, plaintiff reported to the medical unit saying that "he has been constantly harassed by his supervisor," presumably meaning Berry, while working on the parcel bundle sorter.  (Pl.'s Ex. 7.)  Because plaintiff was going to begin his new assignment in Robotics under a different supervisor the next day, the medical officer decided to send plaintiff home as "medically unfit" for the day but "fit tomorrow to return without a medical exam" by an outside doctor.  (*Id.*)

**B.**      **April - November 2004: Plaintiff's Time in the Robotics Unit**

Plaintiff began work in Robotics on April 3, 2004.  (*See* Pl.'s Ex. 7.)  Plaintiff's supervisor in this new assignment was Michael Fair.  (Franklin Dep. at 11-12.)  Although a mail handler's formal job description encompasses a wide variety of responsibilities (*see* Pl.'s Ex. 46 (position description for Level 4 mail handler)), plaintiff's "only duties" in Robotics consisted of loading and unloading flat trays and letter trays onto a conveyor belt.  (Franklin Dep. at 23.)  Plaintiff also "had some issues" with Fair (Pl.'s Ex. 21 at 5), but his only encounters with Berry until October 2004 were limited to what he described as "rolling eyes" and "dirty looks," which

no longer bothered him because he "didn't work directly with her now." (*Id.* at 4.)

### 1.    Plaintiff's Light Duty Submissions of June and July 2004

Within the Postal Service's administrative structure, "light duty" status refers to a "less strenuous" work assignment "available to those employees whose limitations are not due to occupational injury or illness," *Peebles v. Potter*, 354 F.3d 761, 764 n.3 (8th Cir. 2004), but rather to "injur[ies] outside of their job duties." *Hancock v. Potter*, 531 F.3d 474, 477 (7th Cir. 2008). "[T]he Postal Service decides who is eligible for light duty, subject to its collective bargaining obligations . . . ." *Guarino v. Potter*, 102 F. App'x 865, 868 (5th Cir. 2004). Light duty assignments are made available to mail handlers (such as plaintiff) pursuant to agreements between their union and USPS, with the understanding that light duty "is not unlimited and will be consistent" with the needs of the Postal Service. (Pl.'s Ex. 43 at 2 (Item M); *see also* Def.'s Ex. 9.) A mail handler who is "recuperating" from an illness or injury may seek temporary light duty by submitting a "written request" to the head of his postal installation, along with a "medical statement" from his physician. (Def.'s Ex. 9 at 53 (Section 13.2(A)).)

On June 18 and 21, 2004, a USPS medical official granted plaintiff clearance to return to a light duty assignment. (Pl.'s Exs. 8, 9.) Plaintiff submitted these clearances to supervisor Fair and FMLA coordinator Jordan in an effort to obtain light duty "in reference to [his] left knee." (2005 Franklin Aff. at 3.) On July 21, 2004, the health unit also received plaintiff's Duty Status Report, signed by his physician and detailing specific medical limitations related to his knee condition. (Pl.'s Ex. 65 (July 1, 2004 Duty Status Report) at 1.) Defendant received that same physician's FMLA certification of plaintiff's knee condition on September 9, 2004. (*See id.* at 4.)

Plaintiff requested Equal Employment Opportunity ("EEO") counseling on August 9, 2004, in part to complain that supervisor Fair did not grant plaintiff light duty in response to his submissions of disability documentation. (*See* Pl.'s Ex. 24 (Jan. 13, 2005 EEO letter from Claudia Pleasant to plaintiff) at 1.) Fair explained to the EEO counselor that although plaintiff "made a statement" citing his light duty request, he did not "go through the medical unit for authorization." (*Id.*) Regarding plaintiff's disability claims, Fair indicated that he only knew that plaintiff "kept calling in on FMLA [leave] every few days" and that those leave requests were being handled by FMLA coordinator Jordan. (*Id.*)

### 2.    The Incidents of October/November 2004[6]

Berry replaced Fair as supervisor of Robotics sometime around October 21, 2004. (Pl.'s Facts at 2.) On October 26, 2004, plaintiff's Veterans Affairs physician Dr. Jentgen authored a letter to plaintiff's employer requesting assistance in limiting plaintiff's workplace stress. (Pl.'s Ex. 10.) The letter noted plaintiff's gastritis, steroid treatment, mood disorder, lithium treatment, susceptibility to workplace stress, and his claim of "new stress[,] related to potential[l]y having to work with [a] co-worker whom he has had prior conflicts and difficulties with." (*Id.*)

On October 27, 2004, plaintiff arrived for work and learned that Berry would be his new supervisor. (Pl.'s Ex. 20 (plaintiff's Oct. 27, 2004 Voluntary Statement to U.S. Postal Police) at 1.) Plaintiff reminded floor manager Carolyn Talley of his past problems with Berry, warned

---

[6] While both parties have described certain events (such as the "unsleeving" incident and the decision to transfer plaintiff to the West Dock) as occurring entirely on October 27, 2004, plaintiff has elsewhere described some of these same events as taking place on November 17, 2004. (*See, e.g.*, Pl.'s Ex. 63 (plaintiff's Nov. 17, 2004 informal complaint).) For the Court's convenience in recounting the facts, the Court will treat the "unsleeving" incident and plaintiff's meeting with Talley, Tucker, and Watson as having occurred on November 17. However, this does not raise a material issue of fact that would preclude summary judgment, because neither party disputes the fact that these events occurred, nor do their arguments rest upon the precise timeline.

Talley that "we have a situation here," asked her to find him a union shop steward to speak with "[b]ecause just the thought of working with [Berry] made [him] ill" and requested re-assignment to another area under another supervisor.  (*Id.*)  Plaintiff also appears to have given Dr. Jentgen's letter to Talley around this time.  (*See* Pl.'s Ex. 55 (Talley EEO Aff., Aug. 1, 2005) at 2; Pl.'s Ex. 10 (stamped received on Oct. 27, 2004).)

Feeling unwell with a headache and stomach pain, plaintiff then reported to the nurse's office.  (Pl.'s Ex. 20 at 1-2.)  After waiting unsuccessfully for a shop steward to arrive, plaintiff went to Talley's office to ask if she had "gotten a shop steward for" him.  (*Id.* at 2.)  While plaintiff was there, Berry stopped by and told plaintiff to return to his assigned position or she would have him "taken [] off the clock."  (*Id.* at 3.)  Plaintiff summoned the Postal Police because he felt that "if this lady continues to conduct herself in that manner then [there] would or could be [an] even bigger problem."  (*Id.*)  Berry left the room while plaintiff began to write a statement for the Postal Police.  (*Id.*)  Berry then returned to Talley's office to insist that plaintiff return to work, which plaintiff characterized in his Postal Police statement as "harassing" him by "standing in the doorway in her stern voices saying what [plaintiff] better do," repeating her remarks "over and over, [and] over."  (*Id.* at 4; *see also* Berry Dep. at 22.)  Following this encounter, plaintiff's gastritis worsened and he visited the hospital.  (Pl.'s Ex. 22 (plaintiff's Nov. 1, 2004 informal complaint); Pl.'s Ex. 11 (Nov. 9, 2004 letter from Dr. Yonouszai).)  Plaintiff took sick leave beginning on October 28, 2004.  (Pl.'s Ex. 11.)  He wrote an informal discrimination complaint regarding these events on November 1, 2004.  (Pl.'s Ex. 22.)

On November 9, 2004, Veterans Affairs physician, Dr. Yonouszai, evaluated plaintiff and wrote a letter to plaintiff's employer, offering his opinion that "no medical/psychiatric reasons []

8

would preclude [plaintiff] from returning to the workplace at this time."  (Pl.'s Ex. 11.)  Dr.

Yonouszai's letter referenced plaintiff's gastritis, expressed the understanding that plaintiff had

left work on October 28 because of "an altercation with a co-worker," and suggested that

"attempts to limit or prevent close contact with this worker may be beneficial to Mr. Franklin's

successful return to work."  (*Id.*)

Plaintiff returned from sick leave on November 10, 2004, with a doctor's letter

(presumably from Dr. Yonouszai), which the Postal Service received on or before November 18,

2004.  (Pl.'s Ex. 63 (plaintiff's Nov. 17, 2004 informal complaint) at 1; *see* Pl.'s Ex. 11 (date

stamp).)  Plaintiff had no further encounters with Berry until November 17, 2004.  (Pl.'s Ex. 63

at 1.)  On November 17, plaintiff arrived at the P&DC and began to load mail onto conveyor

belts by "unsleeving," or unbundling, outgoing mail that had already sorted, bundled, and

processed for distribution.  (*Id.*; Pl.'s Facts at 4; Berry Dep. at 87.)  Berry, who was in that area,

observed what plaintiff was doing and "yell[ed]" at him (Pl.'s Facts at 4), because she thought

that a mail handler of plaintiff's experience should have known not to unsleeve outgoing mail, as

this would cause mail to become lost en route to its destination.  (Berry Dep. at 87-90.)  Plaintiff

"ignored her," and when Berry approached him and instructed him to report to manager Talley's

office, he "ignored her again."  (Pl.'s Ex. 63 at 1.)  According to Berry, plaintiff "just stood

there" and "stared at [her] blankly," and she was concerned by his "awkward look" because she

"didn't want to have a scene in the operation."  (Berry Dep. at 90-91.)

Berry then left and sent shop steward Monique Watson to instruct plaintiff to report to the

manager's office.  (Berry Dep. 91; Pl.'s Ex. 63 at 1.)  Plaintiff did not comply, telling Watson

that she should know that plaintiff and Berry could not "be in the same room because of

[Berry's] demeanor."  (Pl.'s Ex. 63 at 1.)  After Watson left, acting plant manager Melvin Tucker approached plaintiff and "requested [plaintiff's] presen[ce] in the Manager's Office."  (*Id.*) Plaintiff agreed to meet with Tucker, Talley, and Watson outside of Berry's presence.  (*Id.* at 1-2.)  During that meeting, plaintiff recounted his issues with Berry, and Watson indicated that plaintiff's issues with Berry had "become a health and safety issue for all involved."  (*Id.* at 2.) Tucker and Talley decided to separate plaintiff from Berry's immediate supervision and transfer him to the West Dock under a different supervisor – Andrew Kingsberry.  (*Id.* at 3; Franklin Dep. at 15-16; Def.'s Ex. 4 (excerpts of Carolyn Talley Dep., Feb. 10, 2006) ["Talley Dep."] at 31.)  Plaintiff did not object to the transfer.  (Franklin Dep. at 15.)  However, he wrote an informal discrimination complaint shortly thereafter, recounting the day's events.  (Pl.'s Ex. 63.)

Although Berry was not present at the November 17, 2004 meeting, Tucker later informed her that he did not want plaintiff to continue working around Berry.  (Berry Dep. at 91-92.)  Tucker told Berry that he was concerned about the correspondence from plaintiff's physicians that had referenced plaintiff's mood swings and a workplace "altercation" between him and an unnamed co-worker.  (*Id.* at 92; *see also* Talley Dep. at 30; USPS Decision at 11.)

### C.      November 2004 - January 2006: Plaintiff's Time on the West Dock

Plaintiff was transferred to the West Dock shortly after November 17.  While there, he undertook "housekeeping" duties that consisted of straightening flat trays and letter trays, stacking trays in piles, and putting trays in containers to be shipped to other locations.  (Franklin Dep. at 16-17.)

In early December 2004, plant manager Darryl Martin learned that plaintiff had been transferred to the West Dock.  (Berry Dep. at 95.)  When Martin learned the reasons for the

reassignment and read the letters from plaintiff's physicians, he told Berry to initiate the process

for plaintiff to report for a "fitness-for-duty" examination ("FFD exam").  (*Id.* at 96.)  The FFD

exam is a "medical assessment" whose purpose "is to ascertain whether or not the employee is

medically capable of meeting the requirements of his or her job."  (Def.'s Ex. 5 (USPS

Management Instruction) at 1.)  Martin told Berry that even though she was no longer plaintiff's

direct supervisor in his new West Dock position, Berry remained plaintiff's administrative

supervisor as manager of the "tour" in which he worked; accordingly, they needed to determine

whether plaintiff was able to keep working there in light of Berry's ongoing overall supervision.

(Berry Dep. at 96; *see also* Talley Dep. at 23 (citing plaintiff's "mood swings" and "actions" as

reasons for exam).)

On December 8, 2004, Berry filed a formal request for plaintiff's FFD exam, which

Martin endorsed in his capacity as "Facility Manager."  (Pl.'s Ex. 12.)  Berry based her request

on the letters from plaintiff's physicians and on Berry's own perception of how Franklin looked

during the unsleeving incident.  (Berry Dep. at 43.)  The request stated that plaintiff had

> submitted medical documentation that states he has a mental problem.  The
> possibility that his emotional problems could put people who must interact with
> him at risk must be resolved.  It poses a potential danger for employees with
> whom Mr. Franklin must interact.  I believe that if we must accommodate him, it
> should be through DRAC [District Reasonable Accommodation Committee].
> Otherwise, he can resign or request disability retirement if he is medically or
> emotionally incapable of meeting the requirements of his job by being able to
> safely interact with his fellow employees that he must come in contact with.  I did
> not observe any unusual behavior.  However, his physician has stated that he has
> emotional problems that could put people at risk.  He left work on 4/2/04 because
> of an incident.  He is regularly absent from duty on FMLA [leave] but because he
> has several FMLA qualified conditions, he uses the conditions for which he does
> not have to bring documentation.  I suspect that many of the absences are due to
> the emotional problems for which he must submit documentation and may be
> required to be cleared by the medical unit before being allowed to return to duty.

(Pl.'s Ex. 12 (citations omitted).)

11

On December 14, 2004, plaintiff submitted an informal discrimination complaint regarding Berry's supervision in early 2004.  (Pl.'s Facts at 13; Pl.'s Ex. 23 (plaintiff's Dec. 14, 2004 informal complaint).)  Plaintiff began his letter by stating his name and that he was "in fear of losing [his] job, losing [his] life, or causing harm to other employees," and closed it by explaining that he had been brought "to the point of no return."  (Pl.'s Ex. 23.)  Plaintiff also requested EEO counseling on December 23, 2004.  (*See* Pl.'s Ex. 24 at 1.)

On January 13, 2005, plaintiff received an EEO letter notifying him of management's response to his prior counseling requests.  (Pl.'s Ex. 24.)  That same day, he was mailed notice of his right to file a formal EEO complaint.  (Pl.'s Ex. 26.)  On February 8, 2005, plaintiff wrote an informal complaint about how Berry appeared to be improperly empowered to approve or disapprove his FMLA leave requests.  (Pl.'s Ex. 25.)  In that letter, plaintiff also expressed his belief that despite being transferred to the West Dock "[as a] result of [Berry's] behavior," Berry continued to "interfere[] with him," citing as evidence the fact that he had "lost wages" and may have also had his leave time affected.  (*Id.* at 1-2.)  On February 17, 2005, plaintiff filed a formal EEO complaint regarding his leave requests, but that case was closed on March 3, 2005.  (*See* Pl.'s Ex. 42 (USPS complaint listings, citing Case No. 1K-201-0062-04).)

In February 2005, Angela Liles-Nelson replaced Kingsberry as West Dock supervisor. (Franklin Dep. at 16-17; Pl.'s Ex. 56 (Liles-Nelson EEO Aff., June 5, 2005) at 1.)  On February 24, 2005, Liles-Nelson informed plaintiff that Berry had instructed him to report to the medical unit for a FFD exam.  (Pl.'s Ex. 27 (plaintiff's Feb. 24, 2005 informal complaint); Pl.'s Facts at 8.)  Plaintiff reported for his exam, but he subsequently wrote an informal discrimination complaint.  (Pl.'s Ex. 27.)  On March 10, 2005, plaintiff was again instructed to report for a

physical FFD exam on March 18, 2005 and a psychiatric FFD exam on March 24, 2005.  (Pl.'s

Ex. 13.)  Plaintiff reported for his March 18 physical FFD exam.  (Pl.'s Ex. 14 (Mar. 18, 2005

physical FFD assessment).)  The doctor conducting that exam did not issue any restrictions on

plaintiff's ability to lift, but did restrict plaintiff from kneeling, bending, and stooping, and from

climbing or standing at certain inclinations, and suggested these accommodations would allow

plaintiff "to perform the essential functions of [his] position effectively and safely." (*Id.* at 6.)

Plaintiff did not, however, report for his March 24 psychiatric FFD exam, but did attend the

rescheduled exam on April 13, 2005.  (Pl.'s Ex. 15 (Apr. 6, 2005 letter from Berry to plaintiff);

Pl.'s Ex. 16 (Apr. 21, 2005 psychiatric FFD assessment).)  The doctor conducting that exam

concluded that plaintiff was "medically fit" to return to work:

> Currently, he does not present a threat to himself or others, and is not likely in the
> future to act out in a violent manner.  Although it is difficult to predict violence
> with certainty, Mr. Franklin does not have a history of acting violently and
> although emotionally labile and possibly irritable at times, it does not appear that
> he has been dangerous or violent by history.

(Pl.'s Ex. 16 at 2.)

On March 29, 2005, plaintiff contacted the EEO office to complain about what he

claimed were Talley's denials of his light duty requests since June 2004.  (*See* Pl.'s Ex. 30 (June

9, 2005 EEO inquiry report).)  On April 6, 2005, plaintiff returned to work from time off "due to

knee [and] wrist problems."  (Pl.'s Ex. 28 (plaintiff's Apr. 6, 2005 informal complaint) at 1.)

Kaiser, plaintiff's medical provider, issued a form indicating that he had been released for

"regular work." (USPS Decision at 12 (quoting form dated Apr. 4, 2005).)  Supervisor Waverlye

Vaughan, who oversaw the flat sorter mail operation, requested additional mail handlers to help

fill in for absent employees on her operation.  (Def.'s Ex. 8 (Vaughan EEO Aff., Aug. 21, 2005)

["Vaughan Aff."] at 3.)  The job required lifting mail trays and placing them in a container at the

13

end of the flat sorter belt.  (*Id.* at 5.)  West Dock supervisor Liles-Nelson sent plaintiff and

another employee over to Vaughan's operation; when plaintiff arrived at approximately 9:45

a.m., he told Vaughan that his medical restrictions prevented him from working there, singling

out a slight swelling in his left wrist.  (*Id.* at 3; Pl.'s Ex. 28 at 1; Pl.'s Ex. 29 (plaintiff's Apr. 8,

2005 informal complaint).)  However, as of that date, plaintiff had "not even received restrictions

for [his] left wrist."  (Pl.'s Ex. 28 at 2.)  Vaughan inquired of Liles-Nelson as to whether plaintiff

could work on her operation; Liles-Nelson indicated that Berry had approved sending plaintiff to

Vaughan, and that Liles-Nelson and Berry knew of no relevant medical limitations.  (Vaughan

Aff. at 3, 5-6.)  Nonetheless, Vaughan decided to "make it easy" on plaintiff by instructing the

other workers to half-fill the trays and letting plaintiff sit while the trays were filled.  (*Id.* at 3;

Pl.'s Ex. 28 at 1; Pl.'s Ex. 29 (plaintiff's Apr. 8, 2005 informal complaint) at 1.)  Within an hour,

plaintiff's wrist had become noticeably swollen, and his left knee had also swollen slightly.

(Pl.'s Ex. 28 at 1-2.)  He visited the medical unit, where he was told that he needed to complete

an "accident form" and CA-1 form to be signed by his supervisor because he had suffered a

workplace injury due to "repetiti[ve] lifting."  (*Id.* at 2; Pl.'s Ex. 29 at 2.)  Plaintiff did not fill out

a CA-1 form at the time.  (Pl.'s Ex. 29 at 2.)  Before leaving work for the remainder of the day,

he told Liles-Nelson that he would complete a CA-1 form when he returned to work.  (Pl.'s Ex.

28 at 2.)  Plaintiff also wrote an informal discrimination complaint.  (*Id.*)  On April 8, 2005,

plaintiff returned to work with "bothersome but [] tolerable" injuries and wrote another informal

discrimination complaint.  (Pl.'s Ex. 29 at 2.)  On April 16, 2005, plaintiff submitted a worker's

compensation claim to the Department of Labor regarding his wrist injury.  (*See* Pl.'s Ex. 40

(plaintiff's Mar. 15, 2006 informal complaint) at 1.)

On June 9, 2005, plaintiff filed a formal EEO complaint, alleging discrimination (including a claim for hostile work environment harassment) on the basis of sex, disability, and retaliation.  (*See generally* Pl.'s Ex. 31 (Case No. 1K-201-0028-05).)  The complaint cited his fitness-for-duty exams; the April 6, 2005 flat sorter incident; denials of his light duty requests; denials of his FMLA leave; Berry's general treatment of him; and his prior EEO counseling requests.  (*Id.*)  On June 21, 2005, the Postal Service dismissed plaintiff's harassment claim because the facts alleged did not constitute a hostile work environment.  (USPS Decision at 1.)

On July 12, 2005, plaintiff wrote an informal complaint in which he stated that Berry's "animosity" towards him was "overwhelming" him.  (Pl.'s Ex. 32.)  He cited Berry's "mental abuse" and complained that Berry had requested that he go for a psychiatric FFD exam.  (*Id.*)  Plaintiff believed that Berry was only able to make such a request because she had improperly reviewed his confidential medical files.  (*Id.*)  However, the letter stated that plaintiff had no direct knowledge that Berry had undertaken such an improper review, and that he was "very confused" about why Berry could have issued such a request if she was not "suppose[d] to have any contact" with him.  (*Id.*)

On December 15, 2005, Talley approved a light duty assignment for plaintiff, effective from that day through January 14, 2006.  (Def.'s Ex. 11.)  On December 20, 2005, plaintiff received medical treatment from Kaiser for his knee, and received a "Verification of Treatment" ("VOT") note confirming that he could return to work on December 21, 2005, with knee-related work limitations of "no lifting and two hours of standing a day."  (Pl.'s Ex. 50 (note stamped received by USPS on Dec. 23, 2005).)  Plaintiff does not appear to have returned to work on December 22, 2005, because on January 4, 2006, supervisor Fair conducted a pre-disciplinary

interview with plaintiff for "failure to be regular in attendance" since December 22.  (Pl.'s Ex. 49 (Jan. 4, 2006 pre-disciplinary interview notes).)  Plaintiff indicated that his absence was excused because he had been on FMLA leave throughout 2005.  (*See id.*)

On January 13, 2006, Talley offered plaintiff another light duty assignment, to begin on January 14 in the Robotics unit.  (Pl.'s Ex. 17 at 1.)  This offer was based on plaintiff's July 1, 2004 Duty Status Report, which only specified knee-related limitations on lifting more than ten pounds and on pushing or pulling.  (*Id.*; Pl.'s Ex. 40 at 1.)  Plaintiff accepted the offer but informed Talley that his limitations now excluded all lifting and gave her Kaiser's December 2005 VOT note.  (*See* Pl.'s Ex. 40 at 1; Pl.'s Ex. 35 (plaintiff's Jan. 19, 2006 informal complaint) at 3-4.)  Talley told him that his light duty assignment was "contingent" upon him submitting a formal medical update.  (Pl.'s Ex. 17 at 2.)  Plaintiff explained that it would take Kaiser at least ten days, if not more, to process his official documentation.  (Pl.'s Ex. 35 at 4; Pl.'s Ex. 40 at 1.)

On January 14, 2006, instead of reporting to Robotics, plaintiff began his workday on the West Dock.  (*See* Pl.'s Ex. 35 at 1; *see also* Franklin Dep. at 17.)  Soon after, Berry approached him with another manager and instructed plaintiff to report to Robotics, consistent with Talley's letter of January 13.  (Pl.'s Ex. 35 at 1-2.)  That day, plaintiff complained to FMLA coordinator Jordan about Berry's instructions and submitted a voluntary statement to the Postal Police.  (Pl.'s Exs. 34, 35.)  On January 19, 2006, plaintiff wrote an informal complaint about the incident.  (Pl.'s Ex. 35.)  On January 31, 2006, plaintiff contacted the EEO office to complain of retaliation for filing his June 2005 formal discrimination complaint.  (*See* Pl.'s Ex. 37 (Case No. 1K-201-0015-06).)

**D.        February - March 2006: Events Leading to Plaintiff's Departure**

On February 9, 2006, Talley had not yet received plaintiff's updated medical documentation and wrote to plaintiff noting that he would therefore "return to full duty" at his original Robotics bid assignment when his light duty assignment there expired on February 12, 2006.  (Pl.'s Ex. 17 at 2.)  On February 12, plaintiff "bec[a]m[e] ill" and took sick leave.  (Pl.'s Ex. 40 at 1.)  On February 21, 2006, plaintiff met with an EEO counselor for his initial interview regarding his retaliation claims.  (*See* Pl.'s Ex. 37.)

On March 2, 2006, Berry wrote to plaintiff notifying him that he had been absent from the job on 96 hours of unscheduled leave since February 12, and that he had five days to provide appropriate sick leave or other necessary documentation; otherwise, his status would revert to absent without leave (AWOL).  (Pl.'s Ex. 18.)  Plaintiff returned to work on March 8, 2006. (Pl.'s Ex. 40 at 1.)  He presented his sick leave documentation to Berry.  (*Id.*)  Consistent with Talley's instruction about returning plaintiff to full duty in Robotics if he did not provide updated medical information, Berry informed plaintiff that his new duties in Robotics consisted of "lifting flat and letter[] trays."  (*Id.*)  Plaintiff informed Berry and Talley that he believed that this assignment exceeded his work limitations and gave them a formal request for temporary light duty and two Duty Status Reports, one of which related to his pre-existing knee condition and the other to his workplace wrist injury of April 6, 2005.  (*Id.*; *see also* Pl.'s Ex. 17 at 4-6 (reports and request).)

After plaintiff informed Talley that he had filed a claim for his wrist injury with the Department of Labor in April 2005, Talley consulted with the Compensation office.  (Pl.'s Ex. 40 at 1.)  After reviewing the Postal Service's paperwork regarding plaintiff's injury claim,

Talley saw that it was missing Form CA-17.  That form is used by the Department of Labor's

Office of Workers' Compensation Programs ("OWCP") "to assess whether an employee who has

suffered a work-related injury can be accommodated with limited duties that do not interfere

with the employee's medical restrictions."[7]  *Smith v. U.S. Postal Serv.*, 36 F. App'x 440, 444

(Fed. Cir. 2002).  (*Id.*)  Without the CA-17 form, the P&DC's medical staff was "not sure" about

what to do regarding plaintiff's claimed limitations.  (Pl.'s Ex. 40 at 1.)  Talley informed plaintiff

that she was "not going to have [plaintiff] standing around doing nothing."  (*Id.*)  She also told

plaintiff that based only "on [his] on the job injury to [his] left wrist," he could not stay at work

because she did not know the extent of his limitations.  (*Id.*)

Talley gave plaintiff a CA-17 form and told him to have Kaiser update it with

information regarding his workplace injury before he would be allowed to work.  (Pl.'s Ex. 40 at

1; Pl.'s Ex. 41 (Pl.'s EEO Aff., May 13, 2006) at 2, 10.)  Talley also told him that he should fill

out a leave slip and mark it "COP" ("continuation of pay"), and that he should return the next

day.  (Pl.'s Ex. 40 at 1.)  That same day, Plaintiff "submitted forms for processing" to Kaiser.

(Pl.'s Ex. 44 (Apr. 20, 2006 letter from Kaiser).)

The next day, March 9, 2006, plaintiff returned to work, but reported to his now-expired

light duty assignment.  (Pl.'s Ex. 40 at 1.)  Berry instructed plaintiff to meet with Talley, who

---

[7] For workplace injuries, the Postal Service offers "limited duty" assignments, which are distinct from "light duty" assignments for non-workplace injuries.  *See Peebles*, 354 F.3d at 764 n.3; *accord Hancock*, 531 F.3d at 477.  USPS offers limited duty because the Federal Employees Compensation Act (FECA), 5 U.S.C. § 8101 *et seq.*, "requires that federal employees injured on the job be compensated for their injuries," and the Secretary of Labor "require[s] that the Postal Service make special efforts to employ those injured employees, who will otherwise be compensated for doing nothing."  *Guarino*, 102 F. App'x at 868 (citing 5 U.S.C. § 8102, 39 U.S.C. § 1005(c), and 20 C.F.R. § 10.507(b)).  The OWCP "administers the FECA and is required to provide for limited duty jobs to accommodate employees with compensable job-related injuries."  *Gantner v. Potter*, No. 03-CV-644, 2007 WL 3342305, at *3 (W.D. Ky. Nov. 7, 2007) (citing 20 C.F.R. § 10.507).

inquired about the CA-17 form.  (*Id.* at 1-2.)  Plaintiff explained to Talley that it would take

Kaiser ten days to complete the form, and she told him to report back to her when he arrived at

work the following day.  (*Id.* at 2.)

On March 10, 2006, plaintiff reported directly to Talley, who asked again whether he had

completed the CA-17 form.  (*Id.*)  Plaintiff explained that it was not ready, but asked to continue

working on *light* duty based solely on his knee-related limitations.  (*Id.*)  He also informed Talley

that he would "not be able to perform [his] duties on [his] bid assignment" because of the wrist-

related limitations he claimed on March 8.  (Pl.'s Ex. 17 at 3.)  Talley declined to give him an

assignment based solely on his knee-related limitations and sent him home on continuation-of-

pay status with a letter entitled "Limited Duty Job."  (*Id.*; Pl.'s Ex. 40 at 2.)  The letter explained

that that because plaintiff was "unable to perform" his bid assignment's duties, he would "not be

able to work until" Talley received "updated medicals from [plaintiff's] physician" with

informing her of plaintiff's updated limitations.  (Pl.'s Ex. 17 at 3.)

## III.    PLAINTIFF'S ACTIONS AFTER MARCH 10, 2006

On March 15, 2006, plaintiff wrote an informal complaint regarding Talley's actions.

(Pl.'s Ex. 40.)  On or about March 25, 2006, plaintiff filed another formal EEO complaint for

retaliation because of Fair's January 2006 pre-disciplinary interview; Talley's January 2006

instructions to report to plaintiff's new light duty assignment in Robotics; Berry's January 2006

encounter with plaintiff on the West Dock, where she told him to report to Robotics; and

Talley's subsequent requests for updated medical information and refusal to grant plaintiff

another light duty assignment.  (*See* Pl.'s Ex. 38 (Case No. 1K-201-0015-06).)  On April 5, 2006,

plaintiff's retaliation complaint was amended to include the claim that he was sent home from

work starting on March 10.  (Pl.'s Ex. 68.)  On April 19, 2006, Kaiser finally made available to plaintiff the updated medical forms that he had submitted in March.  (Pl.'s Ex. 44.)

On October 26, 2006, Berry notified plaintiff by letter that he had been absent from work on unscheduled leave since July 1, 2006, and that his cumulative absence was equivalent to approximately 78 working days.  (Pl.'s Ex. 19 (Oct. 26, 2006 letter from Berry to plaintiff).)  The letter warned that plaintiff had five days to provide appropriate sick leave or other necessary documentation, or else his "failure to follow these procedures would lead to the next progressive step."  (*Id.*)  Despite plaintiff's initial continuation-of-pay status, USPS ultimately placed him "in leave without pay status since March 2006."  (Pl.'s Ex. 58 (Def.'s Resp. No. 28 to Pl.'s Reqs. for Admis.); Compl. ¶ 44.)

Plaintiff had originally requested that an administrative judge ("AJ") hear his formal EEO complaint, but on January 9, 2007, plaintiff chose instead to file this action.  (USPS Decision at 2.)  That same day, the AJ remanded the EEO complaint to the Postal Service pending the filing of plaintiff's civil action.  (*Id.*)  On April 3, 2007, the Postal Service issued its final agency decision, which found that plaintiff "failed to prove that [he was] subjected to discrimination as alleged," as he "did not show by a preponderance of evidence that the legitimate, non-discriminatory reasons management gave for its actions were mere pretexts for unlawful gender, disability, or reprisal discrimination."  (*Id.* at 24.)  Plaintiff received the final agency decision it on April 9, 2007.  (Compl. ¶ 9.)  Plaintiff filed this case on July 3, 2007.

# ANALYSIS

## I.       STANDARD OF REVIEW

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Haynes v. Williams*, 392 F.3d 478, 481 (D.C. Cir. 2004) (quoting *Anderson*, 477 U.S. at 248).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Wash. Post. Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If the non-movant fails to point to "affirmative evidence" showing a genuine issue for trial, *Anderson*, 477 U.S. at 257, or "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted).

## II.      EXHAUSTION

Defendant moves to dismiss plaintiff's race-based and hostile work environment claims

on the basis that he failed to exhaust his administrative remedies before bringing suit.[8]  (Def.'s

Mot. for Summ. J. at 1; Def.'s Mem. in Supp. of Mot. for Summ. J. ["Mot."] at 3-4.)  The Court

finds that plaintiff failed to exhaust his race-based claims, but did exhaust his hostile work

environment claims that are not based on race.

### A.      Governing Law

Lodging a timely administrative charge is a prerequisite to filing a Title VII claim in

federal court. *Jarrell v. U.S. Postal Serv.*, 753 F.2d 1088, 1091 (D.C. Cir. 1985).  After an

employee has filed an administrative complaint with the agency accused of discriminatory

practices, the agency has 180 days in which to investigate the matter, after which the

complainant may demand *either* an immediate final decision from the agency *or* a hearing before

an Equal Employment Opportunity Commission ("EEOC") administrative judge.  *See* 29 C.F.R.

§§ 1614.106(e)(2), 1614.108(f).  The employee may then file a civil action within 90 days of

receiving a final decision from the agency, even without appealing that decision to the EEOC.

*See* 29 C.F.R. § 1614.407(a).

These procedural requirements are "part and parcel of the congressional design to vest in

the federal agencies and officials engaged in hiring and promoting personnel 'primary

responsibility' for maintaining non-discrimination in employment."  *Kizas v. Webster*, 707 F.2d

524, 544 (D.C. Cir. 1983) (quoting 42 U.S.C. § 2000e-16(e)).  "Exhaustion is required in order to

give federal agencies an opportunity to handle matters internally whenever possible and to

---

[8] Defendant also seeks to dismiss plaintiff's claims for "handicap" and "harassment."  As the Court has explained, "handicap" is statutorily synonymous with "disability."  *See supra* note 1.  Second, even if the complaint does not include a cause of action for "harassment," claims for "harassment" are typically "indistinguishable" from those for "hostile work environment," and therefore, the Court will not dismiss these claims. *See, e.g.*, *Brantley v. Kempthorne*, No. 06-1137, 2008 WL 2073913, at *1 n.1 (D.D.C. May 13, 2008), *aff'd*, No. 08-5210 (D.C. Cir. Dec. 23, 2008) (per curiam).

ensure that the federal courts are burdened only when reasonably necessary." *Brown v. Marsh*,

777 F.2d 8, 14 (D.C. Cir. 1985).  The deadlines allow an employer to quickly investigate before

evidence becomes stale.  *See Delaware State College v. Ricks*, 449 U.S. 250, 256-57 (1980)

(exhaustion requirement "protect[s] employers from the burden of defending claims arising from

employment decisions that are long past").  Dismissal results when a plaintiff fails to exhaust his

administrative remedies.  *See, e.g.*, *Gillet v. King*, 931 F. Supp. 9, 12-13 (D.D.C. 1996), *aff'd*,

132 F.23 1481 (D.C. Cir. 1997).  But failure to exhaust is an affirmative defense, and the burden

rests with the defendant.  *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997);

*Marsh*, 777 F.2d at 13.

## B.      Racial Discrimination

Count I of the complaint claims "disparate treatment based on . . . race . . . ." (Compl. ¶

51.)  However, plaintiff's underlying EEO complaint of June 9, 2005, does not present any race-

based claims.  (*See* Pl.'s Ex. 31 at 1, 5 (summarizing allegations as showing "a continuing

pattern of discrimination" against plaintiff "based on his disability, gender, his veteran's status

and in retaliation for filing prior EEO complaints").)  Indeed, plaintiff never disputes that he did

not exhaust his race-based disparate treatment claim, nor does he even argue that defendant

engaged in race-based disparate treatment.  It is therefore proper to treat defendant's argument as

conceded.  *See Hopkins v. Women's Div., General Bd. of Global Ministries*, 284 F. Supp. 2d 15,

25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to

a dispositive motion and addresses only certain arguments raised by the defendant, a court may

treat those arguments that the plaintiff failed to address as conceded."), *aff'd*, 98 F. App'x

8 (D.C. Cir. 2004); *Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp. 2d 154,

159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").  Plaintiff's claim of race-based disparate treatment is therefore not properly before the Court.

Count II of the complaint pleads a hostile work environment generally (Compl. ¶ 52), but plaintiff's opposition to defendant's motion narrows his hostile work environment claim to one "based on race, disability[,] and retaliation."  (Opp'n at 18.)  Since plaintiff's EEO complaint contains no references to any racially motivated comments or actions that might constitute racial harassment, the Court finds that plaintiff failed to exhaust his administrative remedies as to a hostile work environment claim based on race.  Accordingly, the Court dismisses plaintiff's race-based disparate treatment and race-based hostile work environment claims, and grants defendant's motion as to these claims.[9]

### C.    Hostile Work Environment Based on Disability and Retaliation

Defendant concedes that plaintiff's EEO complaint of June 9, 2005 had originally alleged a hostile work environment.  (Reply at 2; *see* Pl.'s Ex. 31 at 2.)  USPS dismissed that allegation on June 21, 2005.  (USPS Decision at 1.)  Defendant contends that the allegation was dismissed because it was untimely filed.  (Mot. at 4.)  However, the record does not support this argument.  The Postal Service's final agency decision states that two unspecified allegations were dismissed as untimely, but also states that one claim, "*alleging harassment*, was dismissed because the record failed to demonstrate that the allegations . . . , when viewed individually or collectively, were severe or pervasive enough to create *a discriminatory hostile environment*." (USPS Decision at 1 (emphasis added).)  Given this statement by the agency, the Court is unpersuaded

---

[9] Even if plaintiff had properly exhausted these race-based claims, the Court finds no evidence in the record to support them.

by defendant's argument that plaintiff's hostile work environment claim was untimely filed.

Defendant also argues, without legal support, that plaintiff's claim was not exhausted because he "failed to oppose the Agency's dismissal" of his claim.  (Mot. at 4; Reply at 2.) Defendant is incorrect.  Plaintiff could not have asked the EEOC or this Court to review a *partial* dismissal of his complaint until the agency issued its final decision on the rest of his complaint. The effect of an agency's dismissal of an administrative complaint "depends on whether the agency dismisses all of a complainant's claims or only some of them."  *Puckett v. Potter*, 342 F. Supp. 2d 1056, 1065 (M.D. Ala. 2004).  When the agency issues a decision dismissing "an entire complaint," that dismissal constitutes "final action," *see* 29 C.F.R. § 1614.110(b), and a plaintiff's receipt of that decision starts the 90-day clock for filing an appeal with the EEOC or a civil action in federal court.  *See id.* §§ 1614.402(a), 1614.407(a).  However, when the agency only partially dismisses a complaint, there is no final action.  *See id.* § 1614.107(b); *see also Puckett*, 342 F. Supp. 2d at 1066 (noting that partial dismissal is not final until agency "takes final action on the remainder of the administrative complaint that was not dismissed").

Here, USPS issued its final agency decision on April 3, 2007, in which it expressly "endorsed and incorporated by reference" the June 21, 2005 partial dismissal of plaintiff's hostile work environment claim.  (USPS Decision at 1.)  Therefore, the Postal Service's dismissal of plaintiff's hostile work environment claim was not finalized until April 3, 2007.  *See* 29 C.F.R. § 1614.107(b).  Plaintiff received the final agency decision on April 9, 2007.  (Compl. ¶ 9.)  At that time, he had fully exhausted his claims and had no obligation to pursue an administrative appeal, because the regulations permitted him to file a civil action on the underlying claims within 90 days.  *See* 29 C.F.R. § 1614.407(a).  *Cf. Puckett*, 342 F. Supp. 2d at 1066 (finding that although

USPS dismissed plaintiff's harassment claim one year before finally dismissing her remaining claims, plaintiff had 90 days from that final dismissal to file lawsuit asserting her harassment claim).

Plaintiff filed his complaint in this Court on July 3, 2007, which was 86 days after he received the final agency decision.  Because his hostile work environment claim was included in that federal complaint, the claim was timely filed.  Therefore, plaintiff properly exhausted his hostile work environment claim, to the extent that it is not based on racial discrimination, and defendant's motion as to this issue is denied.

## III.   GENDER DISCRIMINATION

Title VII "establishes two elements for an employment discrimination case: (i) the plaintiff suffered an adverse employment action (ii) because of the employee's race, color, religion, sex, or national origin."  *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  "A plaintiff must prove both elements to sustain a discrimination claim."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  Although the complaint alleges gender-based disparate treatment generally (Compl. ¶ 51), plaintiff's sole contention is now that he "was discriminated against []on the basis o[f] his gender when he was denied light duty."  (Opp'n at 16.)  Plaintiff contends that he and his co-worker Cheryl Moore were similarly situated and that Moore's January 20, 2006 request for light duty was granted while plaintiff's contemporaneous request was not.  (*Id.* at 16-17.)  Defendant disputes the alleged adversity of this and provides an explanation by characterizing the challenged action not as the outright denial of a light duty request, but the denial of a "light duty request with no medical documentation to support the request."  (Mot. at 8.)  Defendant also explains that plaintiff "was

granted light duty during this time period . . . when he provided the proper documentation for it." (*Id.* at 8 n.4.)

The Court finds that plaintiff has failed to produce evidence sufficient to prove either element of his gender-based disparate treatment claim. *See Baloch*, 520 F.3d at 1195. The Court therefore grants defendant's motion as to plaintiff's claim of gender discrimination.

## A.      Governing Law

Title VII of the Civil Rights Act makes it an "unlawful employment practice" for employers "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Traditionally, courts have examined Title VII claims for discrimination under the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must make a prima facie showing of discrimination by a preponderance of the evidence; second, the employer must "articulate some legitimate, nondiscriminatory reason" for the adverse action; and third, the plaintiff must prove that the employer's stated reason is merely a pretext for status-based discrimination. *See id.* at 802-04. In *Brady v. Office of the Sergeant at Arms*, the D.C. Circuit simplified the *McDonnell Douglas* framework in the context of motions for summary judgment:

> [W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – *and should not* – decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*. Rather, in considering an employer's motion . . . , the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

520 F.3d at 494 (emphasis in original).  When making this determination, courts consider "all relevant evidence" presented by the parties, *id.* at 495, "including that which would be used to establish [the employee's] prima facie case (but not for the purpose of evaluating whether a prima facie case has been established) . . . ."  *Walker v. England*, 590 F. Supp. 2d 113, 138 (D.D.C. 2008).  Where the "employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts."  *Brady*, 520 F.3d at 495.

### B.    Adverse Action

Defendant has proffered a legitimate, non-discriminatory reason for the challenged action, and disputes *both* the existence of an adverse action *and* whether the action occurred because of discrimination.  In such instances, courts may first determine the existence of an adverse action.  *See Baloch*, 550 F.3d at 1196-97 (engaging in adversity inquiry first).  "An 'adverse employment action' within the meaning of *McDonnell Douglas* is 'a *significant change* in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing *significant change* in benefits.'"  *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)) (emphasis added).  Plaintiff argues that he "repeatedly requested and was denied light duty" (Opp'n at 16), presumably between 2004 and 2006.  (*See id.* at 10 (discussing denials of light duty from 2004 to 2006 in context of retaliation).)  The evidence shows that he was granted light duty several times.  (*See* Pl.'s Ex. 1 (light duty notice of May 27, 1997); Def.'s Ex. 11 (light duty approval of Dec. 15, 2005); Pl.'s Ex. 17 at 1 (light duty offer of Jan. 13, 2006); *id.* at 2 (letter of Feb. 9, 2006 referencing provisional extension of light duty following Jan. 13,

2006 offer).)

    The only action that plaintiff presents as sexually discriminatory was defendant's purported refusal to grant him light duty in January 2006. (*See* Opp'n at 16-17.)  Talley actually *offered* plaintiff light duty on January 13, 2006, based on his July 2004 knee-related limitations on lifting more than ten pounds. (Pl.'s Ex. 40 at 1.)  Plaintiff accepted that offer of light duty, but also informed Talley that his limitations now ruled out lifting altogether; unsurprisingly, Talley then "requested that [plaintiff] submit documentation of [his] new restrictions" and advised him that his light duty assignment was "contingent" upon him submitting a formal medical update. (*Id.*; Pl.'s Ex. 17 at 2.)  Plaintiff gave her Kaiser's December 2005 VOT note to corroborate his new limitations and told her that Kaiser would take at least ten days to process the formal updates. (Pl.'s Ex. 40 at 1; Pl.'s Ex. 35 at 3-4.)  On March 8, 2006, plaintiff gave Talley a written light duty request and two Duty Status Reports describing both his knee and wrist conditions and related limitations.[10]  (Pl.'s Ex. 40 at 1; *see* Pl.'s Ex. 17 at 4-6.)  When plaintiff informed Talley that the wrist condition stemmed from an occupational injury for which he filed a worker's compensation claim in April 2005, it became clear that plaintiff should have been seeking *limited* duty rather than light duty.  *See Peebles*, 354 F.3d at 764 n.3; *Hancock*, 531

---

[10] Plaintiff argues that Talley had already received these Duty Status Reports when she offered him light duty on January 13. (*See* Opp'n at 16-17.)  This argument is unsupported by the record.  First, the argument is inconsistent with plaintiff's contemporaneous narrative of how he informed Talley of his new restrictions *after* she offered him light duty on January 13, and that the sole document that he saw fit to give her at that time was his Kaiser treatment verification note.  There is also no evidence that Talley received the Duty Status Reports any earlier than the March 8, 2006 receipt date written on those documents. (Pl.'s Ex. 17 at 4-6.)  The reports lack formal USPS date stamps of the kind found on plaintiff's July 2004 status report (Pl.'s Ex. 65 at 1) or Moore's January 2006 light duty request and status report. (Pl.'s Ex. 60 at 1-2.)  And while the January 2006 status reports do bear a physician's signature of January 12, 2006, the P&DC's "Health Unit Signature" is dated January 23, 2006, a full ten days *after* Talley's January 13 offer of light duty. (Pl.'s Ex. 17 at 4-5.)

F.3d at 477; *Guarino*, 102 F. App'x at 868.  As a result, Talley informed plaintiff that the

medical information in his "Light Duty Status Report" "was submitted on an incorrect form,"

because in order to obtain a "Limited Duty Job," he needed to submit a CA-17 form.  (Pl.'s Ex.

17 at 3; Pl.'s Ex. 40 at 1-2.)  *See Smith*, 36 F. App'x at 444.

Plaintiff's own narrative of the events in question therefore supports defendant's

characterization of the challenged action as the denial of a "light duty request with no medical

documentation to support the request."  (Mot. at 8.)  His evidence also shows that he was

fundamentally mistaken about the duty status and documentation that were appropriate in light of

his work-related wrist injury.  Plaintiff's failure to obtain light *or* limited duty because he did not

comply with defendant's administrative requirements, particularly the submission of correct

medical documentation, does not constitute a "change" in his employment status or benefits, let

alone a "significant" one.  Indeed, an employer's "[f]ailure to assist an employee with an error of

someone else's making (possibly the employee's own) cannot possibly be an adverse

employment action."  *Hussain v. Principi*, 344 F. Supp. 2d 86, 105 n.25 (D.D.C. 2004), *aff'd sub*

*nom. Hussain v. Nicholson*, 435 F.3d 359 (D.C. Cir. 2006).  Accordingly, plaintiff has failed to

show the existence of an adverse action with respect to his gender-based claim.

### C.    Pretext

Even assuming the existence of an adverse action, plaintiff "did not produce sufficient

evidence that his employer's asserted legitimate non-discriminatory reason" for denying his light

duty requests was not "the actual reason and that [he] suffered discrimination on an

impermissible ground."  *Baloch*, 550 F.3d at 1197.  In fact, plaintiff "*concedes* the infractions

that formed the basis for his employer's responses," *id.* at 1200 (emphasis in original), because

he acknowledges that defendant told him, in a letter dated March 10, 2006, that his light duty

status report "was not the proper form" and that defendant wanted him "to file on a CA[-]17 [form]" because of his need for a limited duty job.  (Opp'n 16-17 (citing Pl.'s Ex. 17 at 3).) Plaintiff also does not deny "that he failed to submit the required certification[]," *Baloch*, 550 F.3d at 1200, until at least April 19, 2006, when Kaiser finally made available the medical forms that he had submitted on March 8 for updates.  (*See* Pl.'s Ex. 17 at 3; Pl.'s Ex. 44.)

Plaintiff's evidence regarding a purportedly similarly situated female co-worker's light duty request is insufficient to show that defendant's documentation requirements were merely a pretext for gender-based discrimination.  "Employees are 'similarly situated' when 'all of the relevant aspects' of their employment situations are 'nearly identical.'"  *McFadden v. Ballard, Spahr, Andrews & Ingersoll, LLP*, 580 F. Supp. 99, 109 (D.D.C. 2008) (quoting *Neuren v. Adduci, Mastriani, Meeks, & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995)).  "To make this determination, courts look to, *inter alia*, whether the alleged comparators 'dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Id.* (quoting *Childs-Pierce v. Utility Workers Union of America*, 383 F. Supp. 2d 60, 70 (D.D.C. 2005)).

Plaintiff argues that he and mail handler Cheryl Moore were "similarly situated" because Moore had submitted a Duty Status Report form, dated January 20, 2006, that detailed her medical limitations, just as plaintiff had done around that same time.  (Opp'n at 16.)  However, there are many distinctions between his and Moore's situations and requests.  First, plaintiff's wrist limitations stemmed from an occupational injury for which defendant lacked proper documentation; there is no evidence that Moore's injury was either work-related or insufficiently

documented.  Second, Moore sought light duty for a finite period of 61 to 90 days (Pl.'s Ex. 60 at 1), while plaintiff sought an assignment of indefinite duration.  (Pl.'s Ex. 17 at 6 (checking "other" period of time).)  Third, as Berry indicated in an EEO affidavit, Moore's disability and work limitations were "not the same" as plaintiff's.  (Pl.'s Ex. 53 at 14.)  For example, Moore's status report did not name her particular condition, which was listed as "permanent."  Only plaintiff's knee problems and osteoarthritis were presented as permanent, while the tenosynovitis in his wrist was not.[11]

Moreover, plaintiff's claim that defendant's actions were based on plaintiff's gender is significantly undermined by the fact that plaintiff was indeed offered light duty in January 2006 – the same time that Moore was offered light duty.  Further, plaintiff and Moore's light duty offers were *both* for jobs in the Robotics unit that involved shrink-wrapping and preparing labels. (*See* Pl.'s Ex. 17 at 1; Pl.'s Ex. 60 at 3.)  This evidence, the reasonableness of defendant's explanations, and plaintiff's failure to provide the requested documentation until at least April 19, 2006, undercut any possible inference of discrimination against plaintiff on the basis of his gender.  Accordingly, the Court grants summary judgment as to this claim.

## IV.    RETALIATION

"To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim."  *Baloch*, 550 F.3d at 1198.  Plaintiff contends that in response to his

---

[11] In addition, the limitations presented in Moore's report are not the same as those in plaintiff's report.  As Talley's analysis of those limitations explained, Moore was capable of "[l]ifting up to 5 lbs, one half hour at a time for 4 to 6 hours" and of "[p]ushing ½ hour up to 4 to 6 hours" (Pl.'s Ex. 60 at 3), while plaintiff was "capable of lifting 5lbs for 8 hours, up to 10lbs [for] 4 hours," and "push[ing] and pull[ing] for 8 hours . . . ."  (Pl.'s Ex. 17 at 3.)

complaints about workplace discrimination, defendant retaliated against him by engaging in six

adverse actions:

> (1) denying plaintiff's request for light duty assignments;
>
> (2) ordering plaintiff to submit to fitness-for-duty exams;
>
> (3) conducting a pre-disciplinary interview of plaintiff on January 4, 2006;
>
> (4) forcing plaintiff to work in positions that violated his medical restrictions;
>
> (5) requiring plaintiff to provide updated medical information; and
>
> (6) sending plaintiff home from work on March 10, 2006.

(Opp'n at 10.)

Defendant argues that these actions were not adverse, and that plaintiff has failed to show

any causal relationships between his discrimination complaints and these actions.  (*See* Mot. at

11-13; Reply at 5.)  Defendant also offers legitimate, non-retaliatory explanations for some of

these actions.  Because some of the challenged actions were not materially adverse, and because

plaintiff fails to show that defendant's explanations for other actions were pretexts for retaliation,

the Court grants summary judgment as to all of plaintiff's retaliation claims.

## A.   Governing Law

Title VII makes it unlawful for an employer to discriminate against an employee for his

"opposition to an unlawful employment practice" or his "participation in a discrimination charge,

investigation, or proceeding."  *Burton v. Batista*, 339 F. Supp. 2d 97, 114 (D.D.C. 2004); *see* 42

U.S.C. § 2000e-3(a).  This "anti-retaliation provision protects an individual not from all

retaliation, but from retaliation that produces an injury or harm."  *Burlington N. and Santa Fe Ry.*

*Co. v. White*, 548 U.S. 53, 67 (2006).  The concept of "adverse action" in the retaliation context

is broader than in the discrimination context and can encompass harms unrelated to employment

33

or the workplace "so long as 'a reasonable employee would have found the challenged action materially adverse.'"  *Baloch*, 550 F.3d at 1198 n.4 (quoting *Burlington*, 548 U.S. at 68.)  In other words, a plaintiff must satisfy an objective standard by showing that "the employment action produced an injury or harm that might well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Sewell v. Chao*, 532 F. Supp. 2d 126, 136 (D.D.C. 2008), *aff'd*, No. 08-5079 (D.C. Cir. Feb. 25, 2009) (per curiam); *accord Burlington*, 548 U.S. at 68.

Title VII retaliation claims, like discrimination claims, are also analyzed under the *McDonnell Douglas* burden-shifting framework.  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003).  The *Brady* simplification of that framework, *see* 520 F.3d at 494, also applies with equal force.  *McFadden*, 580 F. Supp. 2d at 109 n.13 (noting that *Brady*'s analysis "is equally applicable to retaliation suits" and citing cases); *see, e.g.*, *Brantley v. Kempthorne*, No. 06-1137, 2008 WL 2073913, at *7 (D.D.C. May 13, 2008) (applying *Brady* principle in retaliation context), *aff'd*, No. 08-5210 (D.C. Cir. Dec. 23, 2008) (per curiam).  Accordingly, where the employer has proffered a legitimate, non-retaliatory reason for an adverse employment decision, the "central question" is whether plaintiff has produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was merely a pretext for retaliating against the employee for his prior opposition to an unlawful employment action.  *Cf. Brady*, 520 F.3d at 494; *see also Brantley*, 2008 WL 2073913, at *7.

However, where the employer has not asserted any non-retaliatory reason at all, plaintiff must still make out a prima facie case of retaliation.  *Cf. Brady*, 520 F.3d at 494 n.2.  To do so, plaintiff must demonstrate that (1) he engaged in a statutorily protected activity; (2) the employer

took an adverse action; and (3) there is a causal relationship between the two.  *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 76-77 (D.D.C. 2007).

    **B.**    **The Challenged Actions**

        **1.**    **Denials of light duty requests**

With respect to the alleged denials of light (or even limited) duty in 2006, the Court has already explained that the evidence shows "that what [plaintiff] terms a 'denial' of [his requests] was in fact the result of his own failure" to comply with administrative requirements that specific medical documentation be submitted.  *Hussain*, 344 F. Supp. 2d at 104 n.25.  *See supra* Analysis, Section III(B).  The same holds true for plaintiff's complaints that supervisor Fair denied his light duty requests in June and July 2004.  Union agreements with USPS make clear that light duty assignments are limited, and that light duty may be sought through "written request[s]" accompanied by appropriate medical documentation.  (*See* Pl.'s Ex. 43 at 2; Def.'s Ex. 9 at 53.)  The light duty "clearances" that plaintiff submitted to Fair and FMLA coordinator Jordan did not constitute light duty *requests*.  (*Compare* Pl.'s Exs. 8, 9, *with* Pl.'s Ex. 17 at 6.)  Similarly, although plaintiff did submit a Duty Status Report and FMLA certification in July and August 2004, he offers no evidence that he actually submitted a light duty *request*, either with those submissions or separately.  On the contrary, the undisputed evidence indicates that Fair's explanation in 2004 or 2005 was that plaintiff had failed to "go through the medical unit for authorization."  (*See* Pl.'s Ex. 24 at 1.)  Given the evidence pointing to plaintiff's repeated failures to comply with defendant's administrative requirements, defendant's refusal to grant plaintiff light duty in 2004 or to extend plaintiff's light duty assignment beyond February 12, 2006 "cannot possibly" be materially adverse actions, *Hussain*, 344 F. Supp. 2d at 104 n.25, nor,

assuming *arguendo* that they were adverse, could any reasonable jury find that they resulted from any retaliatory animus.

### 2.     Fitness-for-duty exams

"The simple fact of being subjected to a medical examination is not *per se* degrading or humiliating . . . ." *Baker v. Potter*, No. 02-CV-525, 2005 WL 843169, at *12 (N.D. Ill. Jan. 20, 2005) (granting summary judgment for USPS on retaliation and disability claims), *aff'd*, 153 F. App'x 393 (7th Cir. 2005). Plaintiff has not produced any evidence that the exams themselves "were particularly grueling or humiliating," *id.*, nor does he specifically allege that these exams "produce[d] an injury or harm." *Burlington*, 548 U.S. at 67. (*See* Compl. ¶ 27.) Rather, at the time, plaintiff noted only that it was "very humiliating" to be "singled out" for FFD exams. (Pl.'s Ex. 27 at 1.) Indeed, plaintiff's argument appears to rest solely upon the *fact* of the exams, and not a claim that they were egregious in some way. (*See* Opp'n at 12 (discussing exams but not describing adverse nature).) The Court rejects plaintiff's premise that FFD exams, or requests to report for them, can be inherently adverse, and notes that USPS regulations encourage supervisors to require fitness-for-duty exams in appropriate circumstances. (*See generally* Def.'s Ex. 5 (USPS management instruction on FFD exams).) *See also Schoffstall v. Henderson*, 223 F.3d 818, 825-26 (8th Cir. 2000) (declining to find FFD exam adverse in discrimination and retaliation context because regulations permitted supervisors to request exams and because USPS was seeking to accommodate employee's medical limitations). The Court therefore concludes that neither the exams, nor plaintiff's orders to report for them, rose to the level of materially adverse actions. *See Baker*, 2005 WL 843169, at *12-*13; *Schoffstall*, 223 F.3d at 825-26; *see also Harrison v. City of Akron*, 43 F. App'x 903, 905 (6th Cir. 2002) (finding

that fitness-for-duty exams were not adverse actions because "[p]sychological examinations . . . are not adverse actions" (citing *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998)).

In the alternative, even if the exams could be adverse actions (which they are not), defendant explains that plaintiff was requested to report for the exams in light of (1) his physicians' letters regarding his mood disorder and interactions with his co-workers, (2) Berry's perception of his behavior during the "unsleeving" incident, and (3) defendant's "liberal" use of FFD exams in light of past tragedies involving USPS employees harming others.[12]  (*See* Mot. at 8 & n.5.)  The record amply supports the legitimate, non-retaliatory nature of this explanation. *See also Fuentes v. Postmaster Gen. of U.S. Postal Serv.*, 282 F. App'x 296, 303-04 (5th Cir. 2008) (accepting defendant's explanation that plaintiff was required to undergo FFD exams, pursuant to regulation, to determine whether plaintiff "was mentally healthy to return to her position" following time away for "work-related stress and anxiety").

In October and November 2004, plaintiff's doctors noted that he was susceptible to mood swings and that he suffered increased stress due to "conflicts," "difficulties," and even an "altercation" with unnamed co-workers.  (Pl.'s Exs. 10, 11.)  Around that time, Berry became concerned by the "awkward" and "blank" look that plaintiff gave her when she instructed him to stop unsleeving the outgoing mail, something an experienced mail handler like plaintiff should have known not to do.  (Berry Dep. at 90-91.)  And in December 2004, plant manager Martin told Berry to begin the FFD process once he also learned why plaintiff was reassigned to the West Dock and read his doctors' letters.  (*Id.* at 96.)

---

[12] Defendant appears to have sought two rounds of FFD exams because the Postal Service "needed another doctor opinion to make sure he was capable to work [*sic*]."  (Pl.'s Ex. 55 (Talley EEO Aff., Aug. 1, 2005) at 2.)

Plaintiff's informal complaints through December 2004 also spoke in ominous terms about his relationship with Berry.  For example, in November, plaintiff wrote with approval that Watson described plaintiff's relationship with Berry as a "safety" issue "for all involved."  (Pl.'s Ex. 63 at 2.)  And in December, even after Berry filed her request for the FFD exam, plaintiff wrote that he was "in fear of losing [his] job, losing [his] life, or causing harm to other employees."  (Pl.'s Ex. 23.)

Notably, Plaintiff does not dispute his behavior regarding the unsleeving incident, and concedes that he did not know that he was not supposed to unsleeve outgoing mail.  (Pl.'s Ex. 67 (Pl.'s Aff., Jan. 16, 2009) ¶ 4.)  He also admitted that he repeatedly "ignored" instructions to report to acting manager Tucker's office.  (Pl.'s Ex. 63 at 1.)  This evidence not only fails to undermine the legitimacy of defendant's proffered reasons for requesting the FFD exams, but it actually supports those reasons.[13]  Therefore, the Court finds that no reasonable jury could find that the exams were ordered for retaliatory reasons.

### 3.    Pre-disciplinary interview in 2006

The Court also concludes that plaintiff's 2006 pre-disciplinary interview for poor attendance was not a materially adverse action.  *See McDaniel v. Potter*, Nos. 06-CV-0803 & 06-CV-1371, 2007 WL 3165807, at *8-*9 (N.D. Ohio Oct. 26, 2007) (finding that USPS employee's pre-disciplinary interview was not materially adverse action as required for prima facie retaliation claim).  "An employer should be entitled to discuss and even critique employees

---

[13] Plaintiff also presumes incorrectly that defendant had formulated the basis for its FFD exam on October 27, 2004, such that the gap of time until the February 2005 exam should cast doubt on defendant's explanation.  (*See* Opp'n at 12.)  Plaintiff ignores that it was not until mid-November when defendant received Dr. Yonouszai's letter referencing plaintiff's workplace "altercation" (*see* Pl.'s Ex. 11), and it was not until December when plant manager Martin became aware of all the relevant facts.  (*See* Berry Dep. at 95-96.)

about legitimate job performance problems without being subjected to suit. That is all that happened here." *Morrison v. Potter*, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005).

Even if the interview was an adverse action, plaintiff would still have to show a causal connection between the action and his prior protected activity, as this is one of those "rare situations" where the prima facie case matters, because "defendant does not assert *any* legitimate, nondiscriminatory reason for the decision . . . ." *Brady*, 520 F.3d at 494 n.2 (emphasis in original). The only protected activity prior to the January 2006 interview was plaintiff's informal complaint of July 12, 2005, six months before the interview. (*See* Pl.'s Facts at 15; Opp'n at 9; Pl.'s Ex. 32.) This temporal relationship is simply too attenuated to support any inference of causation. *See Rattigan*, 503 F. Supp. 2d at 77. Because plaintiff has not made out a prima facie case, the Court finds that plaintiff cannot show that the pre-disciplinary interview was retaliatory.

### 4.      Working in violation of medical restrictions

Plaintiff contends that he was "forced to work in positions in violation of his medical restrictions" on April 6, 2005 and on January 13 and 14, 2006. (Opp'n at 10.) Defendant responds that plaintiff "never provided [d]efendant with the boundaries of his alleged limitations," and therefore cannot claim that defendant "failed to honor" limitations that plaintiff never communicated. (Mot. at 6.)

### a.      *Plaintiff's assignment of April 6, 2005*

With respect to plaintiff's assignment to the flat sorter on April 6, 2005, plaintiff made much of the fact that his left wrist became swollen through "repetiti[ve] lifting" while working that assignment. (Pl.'s Ex. 28 at 2.) Yet, plaintiff noted at the time that he had "not even

received restrictions for [his] left wrist." (*Id.*)  Clearly, defendant could not have violated a non-existent wrist restriction.

Plaintiff also appears to contend that the flat sorter assignment violated limitations related to his knees.  (Pl.'s Facts at 5.)  It is true that plaintiff's knee-related July 2004 Duty Status Report listed limitations on lifting more than ten pounds.  (Pl.'s Ex. 65 at 1.)  Plaintiff estimated that a flat tray weighed 15 to 25 pounds.  (Ex. 28 at 2.)  While it is unclear whether plaintiff's estimation already accounted for Vaughan's instruction to her other workers to half-fill the trays, the Court will assume *arguendo* that plaintiff's work on the flat sorter exceeded the lifting limitations detailed in his July 2004 Duty Status Report.  However, plaintiff's evidence does not cast doubt on defendant's explanation that plaintiff did not properly communicate his lifting limitations *in 2005*.

First, Kaiser issued a form, dated April 4, 2005, which stated that plaintiff was released for "regular work" on April 6, 2005.  (USPS Decision at 12.)  Second, even if plaintiff made a "*request*[] [for] light duty on April 6, 2005" (Pl.'s Facts at 18 (citing Pl.'s Ex. 66) (emphasis added)), that request form contains no date stamp or any other notation indicating when it was actually *received* by the appropriate official.  (*See* Pl.'s Ex. 66.)  Therefore, plaintiff has not shown that USPS received this particular request and understood his limitations before assigning him to the flat sorter.[14]

Also, it is noteworthy that plaintiff's most recent limitations were not found in the July 2004 Duty Status Report, but in the results of his March 18, 2005 physical FFD exam.  Those

_____

[14] The April 6 light duty request indicates that plaintiff regularly started work at 7:00 a.m. (Pl.'s Ex. 66.)  His informal complaints from that day and two days later indicate that he was instructed to report to the flat sorter at 9:25 a.m. and that he arrived at the flat sorter at 9:45 a.m. (*See* Pl.'s Ex. 28 at 1; Pl.'s Ex. 29 at 1.)  Neither of these informal complaints makes any reference to submitting a light duty request form between 7:00 and 9:45 a.m. on April 6, 2006.

FFD exam results indicated that plaintiff's only limitations related to kneeling, bending, and stooping, as well as climbing or standing at certain inclinations. The doctor had indicated that honoring these limitations would allow plaintiff "to perform the essential functions of [his] position effectively and safely." (Pl.'s Ex. 14 at 6 (Boxes 2 & 5.) The doctor issued *no* restriction on lifting.

In addition, plaintiff does not contend that the flat sorter position was inconsistent with the results of this *fitness-for-duty* exam, nor does he offer any evidence that at some time between March 18 and April 6, 2005, he gave defendant appropriate medical documentation of lifting restrictions that would have superceded the conclusions of the doctor who conducted this March 18 FFD exam. The Court therefore finds that plaintiff has failed to demonstrate that he was assigned to the flat sorter for retaliatory reasons.

> **b.   *Plaintiff's assignments of January 13 and 14, 2006***

Plaintiff offers no argument as to why his medical limitations were "violated" on January 13 and 14, 2006. Even if he had, his own evidence demonstrates that any such violation occurred for the reasons defendant has provided. (*See generally* Pl.'s Exs. 17, 35, 40.) On January 13, plaintiff was nearing the end of a light duty assignment that Talley had given him a month earlier, and he accepted Talley's offer of a new light duty assignment, based on his July 2004 status report's lifting limitations, beginning the next day in Robotics. Despite accepting the offer, plaintiff also informed Talley that his limitations now excluded lifting altogether, and he indicated that he would eventually provide the necessary medical documentation from Kaiser as required by Talley. Therefore, it is clear that on January 13, plaintiff accepted an assignment that was calibrated to the *only* medical limitations that he had properly substantiated up to that

point.  This evidence supports defendant's explanation that USPS could not yet honor a new

limitation for which plaintiff had not yet provided the necessary documentation.

On January 14, although plaintiff had accepted the light duty assignment in Robotics, he

reported instead to his old West Dock assignment.  Only when Berry instructed him to report to

Robotics did he finally go there.  Since plaintiff had not yet obtained formal medical updates

from Kaiser, he still could not have communicated his purported medical limitations to

defendant.  Therefore, based on this evidence, no reasonable jury could conclude that

defendant's explanations for the actions of January 13 and 14 were pretextual.

### 5.     Requests for updated medical information

The Court finds that defendant's requests for plaintiff's updated medical information on

February 9, 2006 and March 8, 2006 were not materially adverse actions.  *See, e.g.*, *Gage v.*

*United States*, No. 05-CV-2902, 2008 WL 974044, at *5 (N.D. Ohio Apr. 07, 2008) (rejecting

plaintiff's argument that "request for medical information" was adverse action for purposes of

retaliation and hostile work environment claims); *Browne v. City Univ. of New York*, 419 F.

Supp. 2d 315, 335 (E.D.N.Y. 2005) (finding no adversity where plaintiff alleged retaliation

through "requirement that he submit additional medical documentation for an extension of

disability leave"), *aff'd*, 202 F. App'x 523 (2d. Cir. 2006).  *Cf. Schoffstall*, 223 F.3d at 825

(finding, in discrimination context, that "[r]equiring comp[l]ete documentation of an injury the

employer is accommodating" is not adverse action).  Moreover, these requests are inseparable

from the factual issues surrounding the actions that plaintiff characterizes as assignments that

violated his medical restrictions.  As a result, defendant's explanation that plaintiff "never

provided [d]efendant with the boundaries of his alleged limitations" (Mot. at 6) is equally

applicable to defendant's request for updated medical information.

Plaintiff's evidence clearly demonstrates that these requests were legitimate, non-retaliatory responses to plaintiff's own insistence that defendant's medical information about him was outdated.  Talley's January 13 offer was based on his July 2004 limitations, and when plaintiff accepted the offer, he informed Talley that those limitations were outdated.  (Pl.'s Ex. 40 at 1.)  Talley then "requested that [plaintiff] submit documentation of [his] new restrictions" and advised him that his light duty assignment was "contingent" upon her receipt of a formal medical update from Kaiser.  (*Id.*; Pl.'s Ex. 17 at 2.)  Plaintiff indicated that he would.  Three weeks later, Talley had not yet received the updates, so on February 9, 2006, Talley informed him that his light duty assignment would expire on February 12.  (Pl.'s Ex. 17 at 2.)  When plaintiff returned to his full duty Robotics bid assignment on March 8, he gave Talley two Duty Status Reports, one of which pertained to his workplace wrist injury of April 2005 for which he had filed a claim with the Department of Labor.  (*See* Pl.'s Ex. 40 at 1.)  As a result, plaintiff's request should therefore have been properly characterized as one for "limited duty" rather than "light duty."  *See Peebles*, 354 F.3d at 764 n.3; *Hancock*, 531 F.3d at 477; *Guarino*, 102 F. App'x at 868.  *See also supra* note 7 and Analysis, Section III(B).

When Talley discovered that plaintiff's file was missing the CA-17 form used to assess whether work-related injuries can be accommodated through limited duty assignments, *see Smith*, 36 F. App'x at 444, and after medical staff demonstrated their own uncertainty about how best to proceed, Talley concluded that defendant could not ascertain the scope of plaintiff's wrist-related medical restrictions.  (*See* Pl.'s Ex. 40 at 1.)  Talley then gave plaintiff a copy of the missing form and told him that he must complete it before he would be allowed back to work,

because, as she later told plaintiff, she would not permit him to "stand[] around doing nothing."
(*Id.*)  Talley's statement is wholly consistent with federal policies that require USPS to make
"special efforts" to find assignments for employees who are legally entitled to compensation for
occupational injuries, so that they are not "compensated for doing nothing."  *Guarino*, 102 F.
App'x at 868.  "[P]laintiff does not dispute the factual basis underlying defendant's
explanations" for requiring updated medical information.  *Brantley*, 2008 WL 2073913, at *7.
(*See* Opp'n at 17 ("[Talley] rejected [plaintiff's] updated medicals because [p]laintiff had not
provide[d] them on a CA[-]17 form.").)  He "has therefore failed to introduce any evidence that
would permit a trier of fact to believe that defendant's proffered rationale for its decision . . . was
pretextual or that its decision was motivated by a retaliatory animus."  *Brantley*, 2008 WL
2073913, at *7 (citing *Brady*).

### 6.    Being sent home from work on March 10, 2006

Defendant's decision to send plaintiff home from work on March 10, 2006 is factually
inseparable from defendant's request for plaintiff's updated medical information; although
defendant told plaintiff to provide an updated CA-17 form on March 8 as a condition of work,
plaintiff was unable or unwilling to submit that form until April 19, 2006 at the earliest, if at all.
For this reason, defendant's explanation that plaintiff "never provided [d]efendant with the
boundaries of his alleged limitations" (Mot. at 6) is necessarily applicable to this challenged
action as well.

Being sent home from work is not adverse *per se*.  *See, e.g.*, *Walker v. Johnson*, 501 F.
Supp. 2d 156, 172 (D.D.C. 2007) (finding no material adversity where plaintiff argued that being
sent home and put on administrative leave was retaliatory).  Rather, "[t]o become a legal claim,

retaliation must 'produce[ ] an injury or harm.'"  *Id.* (quoting *Burlington*, 548 U.S. at 67.)

Therefore, being sent home without pay, as was the case here, would satisfy a prima facie case

for a materially adverse action.  *See, e.g.*, *Howington v. Quality Restaurant Concepts, LLC*, 298

F. App'x 436, 442 (6th Cir. 2008).

Nonetheless, because defendant has proffered a legitimate, non-retaliatory reason for why

plaintiff was sent home, plaintiff must produce sufficient evidence to permit a reasonable jury to

conclude that defendant's reason for sending him home was pretextual.  However, he has not

done so.  Once defendant learned that plaintiff's asserted limitations were due (at least in part) to

an occupational injury for which he had long ago filed a worker's compensation claim, Talley

was correct to state that the "information" in plaintiff's "Light Duty Status Report" "was

submitted on an incorrect form," because plaintiff was actually seeking limited duty, and his

information therefore needed to be submitted on a CA-17 form.[15]  Without that form, defendant

could not put plaintiff to work within "the boundaries of his alleged limitations," as defendant

_____

[15]  As one court has explained,

> [w]hen an employee is injured on-the-job, the Postal Service gives the employee a
> CA-17 form to take to his physician.  The Postal Service has, on the form,
> identified the duties of the injured employee's regular position.  The injured
> employee's physician, after examining the employee, completes the form by
> noting those duties that the employee remains capable of performing and any
> limitation that the employee might then possess.

> Once the injured employee's physician has completed the CA-17 form, the
> employee returns the original to his supervisor.  The supervisor is thus informed
> of the employee's limitations.  The supervisor instructs the employee to retain a
> copy of the form for himself.  The supervisor then retains a copy and forwards the
> original to the Injury Compensation Office at the Management Section Center
> (ICO).  The ICO, in turn, makes a copy of the form and forwards the original to
> the OWCP.  Copies of the CA-17 form are thus retained by the injured employee,
> the supervisor, and the ICO.

*Morales v. Runyon*, No. 91-CV-2355, 1992 WL 396353, at *1 (D. Kan. Nov. 6, 1992) (reviewing
undisputed facts in USPS employee's employment discrimination case).

was required to do by federal policy, *see Guarino*, 102 F. App'x at 868; 20 C.F.R. § 10.507(b), because those boundaries could not be determined.

When plaintiff returned to work on March 10, he insisted that the wrist-related restrictions he asserted on March 8 prevented him from working on his full-duty bid assignment in Robotics.  (*See* Pl.'s Ex. 17 at 3; Pl.'s Ex. 40 at 2.)  Plaintiff's suggestion at that time – that defendant should have assigned him to a less strenuous position based solely on his existing knee-related restrictions – was no solution.  Because plaintiff had not yet completed his CA-17, defendant could not determine the scope of his medical limitations.  Without that determination, defendant could not responsibly assign plaintiff to a position on the basis of medical limitations that he had insisted were obsolete.  Given that plaintiff elsewhere argues that defendant retaliated against him on April 6, 2005, by *ignoring* his protests about his purported lifting limitations and working him to the point of injury (*see* Opp'n at 10-11; Pl.'s Ex. 29), it is disingenuous for plaintiff to argue that defendant also retaliated against him by *heeding* his protests about that very injury and refraining from putting him to work until he provided appropriate documentation.  *Cf. Hancock*, 531 F.3d at 478-79 (finding no adversity, in gender discrimination context, in "attempts by the Postal Service to ensure that [plaintiff] provided it with work but did not work beyond her personal restrictions," such as where there were "disagreements regarding whether work on the meter belt violated her restrictions").  The Court therefore finds that plaintiff has failed to show that defendant's explanations for sending him home without pay on March 10, 2006 are pretexts for retaliation.  *Cf. Lawson v. Potter*, 463 F. Supp. 2d 1270, 1286 (D. Kan. 2006) ("Plaintiff's disagreement with USPS policy on [the need to submit] medical documentation would not cause a reasonable jury to find that defendant's stated reason for

plaintiff's seven-day suspension . . . is a pretext for gender discrimination.").

## V.      DISABILITY DISCRIMINATION

As with a discrimination claim under Title VII, a claim for disability discrimination under the Rehabilitation Act has two essential elements: "(i) the plaintiff suffered an adverse employment action (ii) because of the employee's . . . disability." *Baloch*, 550 F.3d at 1196. The complaint alleges that defendant discriminated against plaintiff "by refusing to accommodate him" and by "treating [him] differently because of his disability and his handicap." (Compl. ¶ 54.)  Plaintiff contends that he suffered adverse actions "when he was sent home" on March 10, 2006 "and when the Agency reasonably [*sic*] failed to accommodate" his "known limitations" with respect to his tenosynovitis and knee problems.  (Opp'n at 14.)

With respect to plaintiff's claim of failure to accommodate, defendant responds that plaintiff never requested a reasonable *permanent* accommodation, and that defendant did grant plaintiff "many temporary accommodations."  (Reply at 5 (citing exhibits); *see also* Mot. at 6 (explaining that plaintiff received certain assignments because he failed to communicate "the boundaries of his alleged limitations").)  And, as previously discussed, defendant's decision to send plaintiff home on March 10, 2006, is factually inseparable from defendant's refusal to grant plaintiff limited duty at that time because, in plaintiff's words, "he did not follow the Agency['s] procedures."  (Opp'n at 16.)  The Court finds that plaintiff has not shown that defendant's explanations are merely pretexts for discrimination against on the basis of disability, and thus, it grants summary judgment as to this claim.

### A.      Governing Law

The Rehabilitation Act prohibits federal agencies from discriminating against qualified

persons with a disability.[16]  Under the Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted . . . by the United States Postal Service."  29 U.S.C. § 794(a).  To establish a prima facie case of disability discrimination, plaintiff must show (1) that he is an individual with a disability within the meaning of the Rehabilitation Act; (2) that he can otherwise perform the essential functions of his job with reasonable accommodation; and (3) that his employer refused to make such an accommodation or discharged him because of his disability.  *Chinchillo v. Powell*, 236 F. Supp. 2d 18, 23 (D.D.C. 2003).

Claims under the Rehabilitation Act are governed by the *McDonnell Douglas* burden-shifting framework.  *McGill v. Muñoz*, 203 F.3d 843, 845 (D.C. Cir. 2000).  Because defendant has proffered several legitimate, non-discriminatory explanations for the challenged actions, the Court applies *Brady*'s simplification of the *McDonnell Douglas* framework.  *See Baloch*, 550 F.3d at 1197 & n.2 (applying *Brady*'s summary judgment analysis to Rehabilitation Act claim).  Accordingly, the Court considers whether plaintiff has produced sufficient evidence that defendant's asserted legitimate non-discriminatory reason for sending plaintiff home and for failing to accommodate him were not the actual reasons for those actions but were a pretext for discrimination based on plaintiff's disability.[17]  *Id*.

### B.    Pretext

Although defendant challenges the existence of an adverse action (Reply at 4), the Court

---

[16] "Because of the similarities between the Rehabilitation Act and the ADA, cases interpreting either are applicable or interchangeable."  *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 n.10 (D.D.C. 2002) (internal quotation marks omitted).

[17] Defendant does not challenge that plaintiff is a person with a disability within the meaning of the Rehabilitation Act.

has already concluded that being sent home without pay is an adverse action (*see supra* Analysis, Section IV(B)(6)) and will assume *arguendo* that a failure to accommodate is inherently adverse. Therefore, the Court limits its analysis to whether plaintiff has shown that defendant's explanations for the challenged actions are pretextual.

As has been discussed, plaintiff's evidence supports defendant's explanation for why Talley sent him home on March 10, 2006, for it shows that (i) he told her that he could not work his Robotics bid assignment because it violated his wrist-related medical restrictions, (ii) those restrictions were based on a workplace injury for which he had already submitted a claim to the Department of Labor, (iii) defendant lacked the necessary CA-17 form to document plaintiff's limitations related to that injury, so it could not determine what would be an appropriate limited duty assignment, and (iv) plaintiff's doctor did not complete the CA-17 form necessary to document those restrictions until April 19, 2006. (*See generally* Pl.'s Exs. 17, 35, 40, 44.) Plaintiff has thus failed to prove the "essential element" of his claim that requires a showing that defendant sent him home "because of" or "solely by reason of" his disability. *Baloch*, 550 F.3d at 1196; 29 U.S.C. § 794(a).

For the same reason, plaintiff has not shown that defendant failed to accommodate him. "An underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999). It therefore "lies with the disabled employee to request needed accommodation." *Evans v. Davis Mem'l Goodwill Indus.*, 133 F. Supp. 2d 24, 27 (D.D.C. 2000), *aff'd*, 1 F. App'x 3 (D.C. Cir. 2001) (per curiam); *accord Thompson v. Rice*, 422 F. Supp. 2d 158, 176 (D.D.C. 2006) ("[T]he employee must supply

'enough information that, under the circumstances, the employer can be fairly said to know of both the disability and *desire for an accommodation.*'" (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999)) (emphasis supplied)), *aff'd*, No. 06-5124, 2008 WL 5511260 (D.C. Cir. Dec. 30, 2008) (per curiam).

Plaintiff's sole contention regarding his request for accommodation is that he sought temporary light duty assignments.  (Opp'n at 15 ("The record does not support the Agency's contention that the Plaintiff did not request an accommodation.  Between 2004 and 2006, Plaintiff's requested for [*sic*] temporary light duty.").)  Plaintiff's evidence shows that he was granted temporary accommodations as early as 1997, and as late as December 15, 2005 and January 13, 2006.  Plaintiff's evidence also shows that when he failed to secure temporary accommodations, it was because he did not comply with the requirements regarding documentation, and as a result, he failed to make a proper request.[18]  Plaintiff never argues that he requested a *permanent* accommodation, nor does he cite to any evidence that he did.

In light of (i) the evidence that defendant granted plaintiff's requests for temporary accommodations on several occasions, (ii) the evidence that plaintiff did not obtain temporary accommodations when he failed to comply with administrative requirements regarding such requests, and (iii) the lack of both evidence and argument that plaintiff ever requested a permanent accommodation, plaintiff has failed to satisfy a requirement of his prima facie case – "that the *request* for accommodation was denied."  *Friends v. Astrue*, No. 06-CV-1762, 2007 WL 1954420, at *3 (D.D.C. July 5, 2007) (emphasis added).  *Cf. West v. Potter*, 540 F. Supp. 2d

---

[18] For example, although plaintiff specified that he gave his June and July 2004 light duty "clearances" to supervisor Fair and FMLA coordinator Jordan, there is no evidence that he submitted a formal written request or "[went] through the medical unit for authorization."  (Pl.'s Ex. 24 at 1.)  And in March 2006, it became clear that plaintiff should not have been seeking *light* duty at all for his work-related wrist injury.

91, 97 (D.D.C. 2008) (rejecting discrimination claim under Rehabilitation Act in part because plaintiff was unable to show "that the Postal Service was unwilling to provide her reasonable accommodation, if needed, to perform the duties of the job").  Moreover, plaintiff has not produced sufficient evidence to permit a jury to infer that defendant's asserted reasons for the challenged actions were actually pretexts for discrimination on the basis of plaintiff's disability. *Baloch*, 550 F.3d at 1197; 29 U.S.C. § 794(a).  The Court therefore grants summary judgment for defendant on plaintiff's claims under the Rehabilitation Act.

## VI.    HOSTILE WORK ENVIRONMENT

Plaintiff argues that he has "made out a claim for hostile work environment based on race, disability[,] and retaliation," related to "ongoing conduct from 2004 to 2006," including his various encounters with supervisor Berry and the "denial of light duty and violation of work restrictions, which caused the Plaintiff mental and physical harm."  (Opp'n at 18 (generally citing exhibits).)  As explained above, plaintiff's hostile work environment claim based on race must be dismissed for failure to exhaust.  *See supra* Analysis, Section II(B).

Title VII and the Rehabilitation Act only prohibit workplace harassment based on a person's membership in a protected class or participation in protected activity.[19]  *See Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002).  "[A] plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

---

[19] Although hostile work environment claims based on retaliation and disability are not as common as those based on race or gender, they are both legally cognizable.  *See Hussain*, 435 F.3d at 366 ("In this circuit, a hostile work environment can amount to retaliation under Title VII."); *Ziegler v. Potter*, 510 F. Supp. 2d 9, 17 (D.D.C. 2007) (setting out prima facie requirements for hostile work environment based on disability).

(1993)) (citations omitted); *accord Pantazes v. Jackson*, 366 F. Supp. 2d 57, 71 (D.D.C. 2005) (quoting *Harris*).  To determine whether a hostile work environment exists, courts should consider "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch*, 550 F.3d at 1201.  Plaintiff cannot satisfy this standard, because none of the acts that he alleges, whether considered alone or cumulatively, meets "the demanding standards" for a hostile work environment claim.  *Sewell*, 532 F. Supp. 2d at 141-42.

Plaintiff fundamentally misunderstands the nature of a hostile work environment claim. It is not a cause of action for the "ordinary tribulations of the workplace," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and "[n]ot everything that makes an employee unhappy is an actionable adverse action."  *Broderick*, 437 F.3d at 1233.  In fact, even when abusive behavior is "motivated by discriminatory animus," it may not be actionable.  *Stewart*, 275 F.3d at 1133 (quoting *Barbour v. Browner*, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999)).  The conduct complained of "must be *extreme* to amount to a change in the terms and conditions of employment."  *Faragher*, 524 U.S. at 788 (emphasis added).  This standard is designed to be "sufficiently demanding" so that anti-discrimination statutes do not become "general civility code[s]."  *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  *See also Vickers v. Powell*, 493 F.3d 186, 198-201 (D.C. Cir. 2007) (noting that district court correctly concluded that hostile work environment was not created solely by three incidents that involved being "singled out for a requirement to provide inordinate amounts of medical information to support requests for leave," poor performance evaluations, supervisor's "angry threats," and derogatory comments about minorities).

As an initial matter, plaintiff cannot rely on the discrete acts upon which he bases his discrimination and retaliation claims, including his claims of "ongoing conduct from 2004 through 2006, which included denial of light duty and violation of work restrictions. . . ." (Opp'n at 18.)  Because plaintiff's allegedly "hostile" events "are the very employment actions he claims are retaliatory[,] he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim."  *Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005); *accord Smith v. Jackson*, 539 F. Supp. 2d 116, 138 (D.D.C. 2008) ("[I]nsofar as Plaintiff attempts to base his hostile work environment claim on his [compressed work schedule] revocation and AWOL charge, he cannot simply regurgitate his disparate treatment claims in an effort to flesh out a hostile work environment claim.")  Cobbling together a number of distinct, disparate acts will not create a hostile work environment, because "[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim . . . ."  *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003); *accord Wada v. Tomlinson*, 517 F. Supp. 2d 148, 211 (D.D.C. 2007), *aff'd*, 296 F. App'x 77 (D.C. Cir. 2008). "[T]he dangers of allowing standard disparate treatment claims to be converted into a contemporaneous hostile work environment claim are apparent.  Such an action would significantly blur the distinctions between both the elements that underpin each cause of action and the kinds of harm each cause of action was designed to address."[20]  *Rattigan*, 503 F. Supp. 2d at 82 (quoting *Parker v. State Dep't of Pub. Safety*, 11 F. Supp. 2d 467, 475 (D. Del. 1998)).

---

[20] And as has been explained, defendant's supposed "denial" of plaintiff's light duty requests were limited to those situations where plaintiff did not submit necessary documentation. This is therefore not a case where "a jury could conclude that the agency frustrated plaintiff's efforts to secure the reasonable accommodations he was entitled to by law."  *Pantazes*, 366 F. Supp. 2d at 71 (denying summary judgment on hostile work environment claim based on disability where plaintiff "offered evidence of alleged statements by various agency officials that suggest a discriminatory purpose, unreasonably lengthy delays by [the agency] in responding to

Further, most of the acts that plaintiff complains about are common workplace grievances and are not the type of "extreme" conduct necessary to support his claim.  For example, on October 27, 2004, when Berry returned to the office where plaintiff was writing his statement to the Postal Police, plaintiff concluded that Berry, after earlier threatening to take him "off the clock," was now "harassing" him because she was "standing in the doorway in her stern voices saying what [he] better do," "over and over, [and] over."  (Pl.'s Ex. 20 at 3-4.)  Plaintiff's formal EEO complaint of June 9, 2005, described this same incident as "continued harassment" and contended that this "and the failure to provide a [shop] steward created a hostile and unsafe work environment."  (Pl.'s Ex. 31 at 3.)  However, the fact that an employee and his immediate supervisor repeatedly "butted heads," that the supervisor "frequently yelled at him during discussions about his work," and that the supervisor "threatened him" with job-related consequences for his refusals to meet workplace expectations does not demonstrate a hostile work environment pervaded by discrimination or retaliation.  *Smith*, 539 F. Supp. 2d at 138-139 ("[A]n 'intense' manager does not a hostile work environment make."); *Singh v. U.S. House of Reps., Comm. on Ways & Means*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting. . . ."); *see also Baloch*, 550 F.3d at 1201 (finding that "totality of circumstances" did not show hostile work environment despite plaintiff's "several verbal clashes with his supervisor in the workplace").

Similarly, following plaintiff's February 2005 FFD exam, he wrote that it was "very humiliating" to be "singled out" for the exam and implied that Berry was unqualified to make the

his requests for accommodations, and an inadequately explained refusal to provide needed [] training").

request because "[s]he has know [*sic*] medical training or license[] as a doctor."  (Pl.'s Ex. 27 at

1-2.)  His 2005 formal EEO complaint then contended that Berry requested the exam "to further

harass and intimidate" him.  (Pl.'s Ex. 31 at 4-5.)  Of course, Berry did not need a medical

background to request the FFD exam, and "[t]he simple fact of being subjected to a medical

examination is not *per se* degrading or humiliating . . . ."  *Baker*, 2005 WL 843169, at *12; *see*

*supra* Section IV(B)(2).  Plaintiff's "allegations of insult are undercut by the legitimate reasons

and constructive criticism" provided by defendant.  *Baloch*, 550 F.3d at 1201.  Defendant cannot

be responsible for plaintiff's subjective belief that Berry was persecuting him by requesting the

exams when, in fact, plaintiff was simply unaware of the reasonable concerns and administrative

process underlying those requests.  *See Smith*, 539 F. Supp. 2d at 138 n.21 ("Plaintiff's

subjective reaction would not transform a non-hostile work environment into an abusive one.").[21]

Although plaintiff may have described a workplace and supervisors that were "hardly

ideal, no reasonable jury could find [that environment] 'abusive' . . . ."  *Hussain*, 435 F.3d at 359

(citing *Harris*).  Plaintiff may have been "injured and inconvenienced," and even "treated

somewhat unkindly.  But there is a significant gap between such conduct, which was

fundamentally personal, and discrimination."  *Hancock*, 531 F.3d at 480.  Accordingly, the Court

grants summary judgment on plaintiff's hostile work environment claims.

---

[21] Although plaintiff contends that defendant's "continual and on-going discrimination" caused him "severe emotional stress" and "mental . . . harm" (Compl. ¶¶ 57-58; Opp'n at 18), this relates only to a "subjective reaction to his work environment, rather than the environment itself."  *Smith*, 539 F. Supp. 2d at 138 n.21.  "The effect on the employee's psychological well-being is, of course, *relevant* to determining whether the plaintiff actually found the environment abusive," *Harris*, 510 U.S. at 22 (emphasis added), but such an effect is merely one factor to take into account when determining whether the environment is "*objectively* hostile or abusive."  *Id.* at 21 (emphasis added).

**CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment [Dkt. # 15] is

granted.  A separate order accompanies this Memorandum Opinion.

**SO ORDERED.**

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE:   March 4, 2009